**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| JERALYN VOLKERT,<br><br>      Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>      Defendant. | No. C08-4044-PAZ<br><br>**MEMORANDUM OPINION AND ORDER** |

_____

This matter is before the court for judicial review of the defendant's decision denying the plaintiff's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The plaintiff Jeralyn Volkert filed her application on March 31, 2004, alleging disability since May 20, 2002. Her application was denied initially and on reconsideration. She had a hearing before an Administrative Law Judge ("ALJ") on March 28, 2006, and on May 20, 2006, the ALJ found Volkert was not disabled. He found that although Volkert has medically-determinable impairments of temporomandibular joint dysfunction, thyroidism, and an adjustment disorder, she does not have a severe impairment or combination of impairments that significantly limits her ability to work. The Appeals Council denied Volkert's request for review, making the ALJ's decision the final decision of the Commissioner.

Volkert filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. On August 21, 2008, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The issue before the court is whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations

omitted). In this deferential review, the court considers the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).

Volkert argues the ALJ erred in failing to fully and fairly develop the record, in failing to make a proper analysis of her subjective complaints, and in stopping his analysis at step two of the sequential evaluation process outlined in the regulations. *See* 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).

Volkert has worked at a wide variety of jobs. She was a school custodian from 1991 to 1999. She worked in sales from 2000 to 2002. She was an elementary school substitute teacher for a period of time in 2003. She also has done seasonal work mowing lawns, doing Christmas deliveries, and working in bean fields.

Volkert testified her physical problems first began in 1983, when she suffered a whiplash injury when the car in which she was riding hit a steer. About a year later, she was involved in another vehicular accident involving hitting a cow. These accidents caused pain in her neck and on her whole left side. In July 2000, she was involved in another accident when she was physically struck in the hip area by a car that had been hit by another car. Since then, she has experienced pain throughout her body, particularly in her neck and back. She suffered a fall in October or November 2005, and another fall in January 2006, although the causes of these falls is not clear from her testimony. She stated "it was just like my right leg was gone."

Volkert complains of continual headaches; an inability to look down; difficulty walking, sitting, and standing; difficulty turning her head from side to side when lying down; and temporomandibular joint pain. She also complains of constant pain in her ribs, in her sciatic nerve down her hip, and muscle pain in her back. Bending, looking down,

and turning her head all make her pain worse. Her hip pain is exacerbated by bending or squatting, sitting on the toilet and turning to try to get the toilet paper, getting in and out of the bathtub, driving, and standing for any length of time.

Volkert indicated she is unable to do much in the way of housework due to pain, and her sleep sometimes is disturbed due to pain. She can walk up to a mile every day or two, and she can sit for up to an hour at a time before the pain requires her to change positions. She can read as long as the book is elevated and she does not have to look down. She can do laundry in stages, doing some in the morning and some in the evening, but she can only carry small amounts of laundry at a time. She does the dishes and minimal dusting but is unable to do any vacuuming. She has difficulty raising her arms above her head.

Volkert's ability to concentrate is affected by her pain. When her attorney attempted to question her about why she is unable to substitute teach, Volkert's responses became rambling and incomprehensible. Her attorney repeatedly called her name to return her focus to him, and then Volkert would begin rambling again. The ALJ also attempted to question Volkert briefly, but she appeared to be incapable of answering his questions.

The record contains medical evidence dating back to Volkert's first automobile accident in February 1983. The court finds medical evidence that dates back many years before Volkert's alleged disability onset date is of little relevance here. What is relevant is Volkert's condition immediately preceding and following her alleged disability onset date. She must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of

substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

In January 2002, Volkert underwent an MRI of her cervical spine to evaluate her complaints of ongoing neck pain since her July 2000 accident. The study showed "mild non compressive anular [sic] bulging of the C3-4 through C5-6 discs," but otherwise was unremarkable. A.R. 490. Volkert had been receiving regular chiropractic adjustments since the accident, but she continued to have symptoms. Mark Muilenburg, M.D. found no signs of a serious problem and advised Volkert she could use Naproxen as needed for pain. He suggested she could have a thorough evaluation for neck and back problems through another provider, if desired. A.R. 221. When Volkert continued to complain of chronic back and neck pain a month later, Dr. Muilenburg scheduled her for an evaluation at Sioux Valley Hospital.

The Sioux Valley team evaluated Volkert on March 4, 2002. An evaluation in the Spine Clinic by Susan Assam, M.D. showed that although Volkert complained of pain with certain movements, she had a functional range of motion of her neck and beck. Her strength was 5/5 and her evaluation otherwise was unremarkable. She was diagnosed with a cervical strain. Ultracet was prescribed for pain management, and amitriptyline was prescribed to help her sleep better. She was sent to the Physical Therapy Clinic for evaluation and instruction in therapeutic exercises.

A Physical Therapy evaluation revealed "very significant restrictions" in Volkert's cervical range of motion. The therapist indicated Volkert needed to "increase the range of motion of the cervical spine in all planes and commence in a good stretching program." A.R. 250. She was given a book of neck exercises and was instructed in other exercises to do at home. She was directed to follow up with a physical therapist closer to her home.

Dr. Assam examined Volkert again on June 3, 2002, and ordered an MRI of her upper thoracic spine to evaluate Volkert's ongoing pain complaints. Volkert saw the doctor on June 26, 2002, for follow-up. Notes indicate the MRI showed "moderately

4

advanced degenerative disc disease, T5-6 through 8-9, basically throughout her thoracic spine. Noncompressive annular bulging at T8-9, T9-10." A.R. 548. Volkert indicated physical therapy was helping her become stronger, but she complained of problems with her concentration and "significantly decreased" thinking. Dr. Assam opined that Volkert's psychological problems were related to pain management, and she recommended a neuropsychological evaluation. (*Id.*).

Volkert saw Dr. Assam again on July 29, 2002, for follow-up of her neck pain. The doctor had prescribed a CASH brace which Volkert had obtained and worn; however, she reported that it caused her hands to go numb and increased her neck pain. In addition, she reported that physical therapy exercises were causing her severe pain. Volkert indicated she had gotten much worse after a neurological evaluation during which a doctor had pushed down hard on the top of her head, causing her severe neck pain. She reported difficulty doing housework. She was directed to continue with physical therapy and to wear the brace as tolerated, and an MRI of her lumbar spine was ordered. A.R. 545.

At Volkert's next follow-up exam, on August 8, 2002, she reported that she continued to attend physical therapy sessions, but she felt they made her pain much worse. She stated that when she did therapy, she was unable to do anything at home, but if she stopped therapy, she could do more activities at home. She continued to see a chiropractor about twice a week. Dr. Assam administered acupuncture which Volkert tolerated well, reporting "some slight improvement in back pain at the time of treatment." A.R. 544. Another acupuncture treatment on August 29, 2002, afforded her some immediate pain relief and relaxation. A.R. 543.

Volkert's condition continued to improve gradually over the next several months, although she continued to experience some back and neck pain. In April 2003, her movements were noted to be much better. Volkert reported she was learning her limitations. She had been substitute teaching intermittently, but stated that teaching two or three days in a week increased her discomfort significantly. She reported that she was

5

unable to sleep on her side, or with her head flexed on a pillow, and she had difficulty doing activities above the head or any extensive thoracic activities.

Volkert saw Dr. Assam in August 2003, and reported that she felt better than she had in the past year. Herbal treatments were helping her memory. She was alternating between walking a mile-and-a-half and riding three miles on a recumbent bike, and she was doing some upper body exercises and mild swimming in the pool. She continued to see a chiropractor regularly. She was signed up to do substitute teaching during the coming school year, as well as "doing some mild computer work." She continued to require assistance with heavy cleaning, mowing, snow removal, and activities requiring her to look down. She continued to complain of problems with her concentration and problem-solving abilities, but the doctor observed that Volkert seemed to be progressing well. A.R. 532.

In November 2003, Volkert was seen by a physician in the Internal Medicine Clinic at the University of Iowa Hospitals and Clinics, "for a potential evaluation and referral to Neuropsychology in Neurology secondary to cognitive disturbance." A.R. 272. Volkert was tearful and gave a "scattered" history. She complained that it took her two to three times longer to complete tasks than it used to. She complained of forgetfulness, and difficulty tolerating situations in which several activities were taking place at once. She was taking a number of dietary supplements and preferred not to take prescription drugs, if possible, although she was taking a thyroid supplement. She agreed to bring her supplements with her to her next appointment so her regimen could be evaluated. She was scheduled for a neurobehavioral study and neurology consultation, and a physical examination.

On January 14, 2004, Volkert saw psychiatrist Eugene C. Oliveto, M.D. for a psychiatric consult. Dr. Oliveto indicated Volkert gave a history of "a whole list of what she thought was wrong with her, including volumes of past history that were impossible to review in an hour." A.R. 278. Volkert became upset with the doctor when he opined Volkert "was bipolar from her history," and she had too many problems for him to

6

address. She subsequently wrote him multiple letters that he characterized as "very critical of me and threatening at times," and he declined to have any further clinical relationship with her. *Id.*

Volkert returned to the Internal Medicine Clinic on January 27, 2004. She brought her dietary supplements with her, and the doctor expressed some concerns regarding what she was taking. She was advised to obtain regular liver function tests, renal function tests, blood counts, and vitamin levels, which she agreed to do. A.R. 268-71.

On February 4, 2004, Volkert was evaluated in the Neurology Clinic for her complaints of chronic pain and cognitive difficulties. No medical cause for her pain could be identified, and the doctor suggested there could be a psychiatric etiology, noting Volkert displayed "somewhat intrusive interpersonal interactions and rambling speech, and multiple somatic complaints within context of wide distribution of neurologic symptoms." A.R. 265. An MRI ruled out structural abnormalities and revealed no significant abnormalities or evidence of brain injury. Volkert was instructed to continue with her physical therapy exercises, and to consider counseling to learn coping strategies for her chronic pain and other complaints. She had elevated transaminase levels which the doctor opined might be due to her dietary supplements, but Volkert was unwilling "to consider altering her intake of supplements at present." *Id.*

Volkert underwent a neuropsychological evaluation at Sioux Valley Hospital on March 23, 2004. Test results indicate she is in the average range of functioning or better in the areas of global cognitive functioning, auditory attention and processing, phonemic fluency, verbal attention and repetition, confrontational naming, word recognition, ability to learn and recall unrelated words, ability to learn and recall simple and complex geometric figures, verbal and visual abstract reasoning, and problem solving.

She achieved results in the low average or borderline range of functioning with regard to verbal sustained attention with minimal manipulation requirements, sustained visual attention requiring coding in a timed format, verbal attention requiring use of visual

7

stimuli in a timed format, word reading, visual attention requiring simple sequencing, visual attention requiring alternate sequencing, semantic fluency, divided verbal attention, immediate and delayed recall of information, and ability to recognize simple and complex geometric figures. She demonstrated "impaired range of function for her dominant hand (less than 1st percentile) and a score in the average range of function for her nondominant hand (27th percentile)." A.R. 242.

It took Volkert several attempts, on two different dates, to complete the MMPI-2 test. When she finally completed the test, it took her more than four hours to finish all of the questions. Volkert was "anxious and apprehensive" throughout the test. The psychologist found the validity of the test to be compromised because Volkert over-analyzed the questions and attempted to "present herself in the best possible light and denied even very common difficulties and problems that people have." *Id.*

The neuropsychologist reached the following conclusions from the results of Volkert's testing:

> In general, the results of her cognitive tests indicate impairments in some of the more basic skills, such as attention, while having intact higher level skills, such as problem solving. In addition, the localization and lateralization of the strengths and weaknesses is very inconsistent. These results do not match any pattern for known brain injury or organic brain disease but are quite often found in individuals who are having a difficult time emotionally adjusting to a stressful situation or who have become overly focused in one aspect of their life, such as physical functioning, to the detriment of other areas. It is most likely that she had diffuse stress and difficulty adjusting to stress previously and it is also possible that she had some mild and transient difficulties as a result of her injury. This combination often leads people to become focused on the injury and the specific event that occurred, sometimes to the point that the injury and the search for treatments becomes cognitively and psychologically consuming. If her stress level

> can be decreased, then her cognitive complaints should be alleviated.

A.R. 243. The doctor recommended that Volkert seek psychotherapy or counseling to assist her with stress management. He further recommended as follows:

> As [Volkert] appears to put a great deal of personal effort, time, and energy into things directly related to this incident and injuries it appears as though her life has become very single focused. For many people this has a tendency to exacerbate difficulties secondary to the emotional stress that it can create. Therefore, it is recommended that she be encouraged to try to create more balance in her life by pursuing interests, hobbies, etc. that would be unrelated to this incident and injury and allow her to have a much fuller life. It may help to remind her that even individuals with very significant life altering injuries, such as paralysis, eventually need to place their focus and energy elsewhere in order to live an enjoyable and full life.

A.R. 244.

On May 17, 2004, an MRI revealed some temporomandibular joint changes. A.R. 276. On June 3, 2004, Volkert saw John E. Clary, D.D.S. "for fabrication of an orthotic splint appliance for the conservative treatment of degenerative joint disease and associated pain as diagnosed by Dr. [Mark] Piper on May 17, 2004." A.R. 332. Dr. Clary noted that during her interview, Volkert's "responses were frequently rambling and often failed to appropriately answer the questions asked." *Id.* He noted little muscle tightness on palpation, although Volkert complained of significant pain in response to even light palpation. Dr. Clary reached the following conclusions regarding Volkert's TMJ pain:

> There appears to be no doubt that [Volkert] has significant degenerative joint disease, especially on the right side. Whether this is the sole cause of her pain experience is less clear and, in fact, is rather doubtful. My opinion is that there are other contributing factors present. [She] reported that one of the practitioners she saw diagnosed her with facial sympathetic dystrophy. Also can not rule out some emotional factors that may be present such as those seen in some chronic

9

> pain patients. Another concern discussed with [her] was the design of the "suck down" retainers that she has been wearing since completion of the orthodontic therapy. This particular type of retainer introduces posterior excursive occlusal interferences which are exactly what we are trying to avoid/eliminate in facial pain cases. When I discussed this with [Volkert], including the recommendation that she not wear the retainers for the time being, she became upset and argumentative and stated that she was not going to not wear the retainers and have her teeth relapse. We explained to her that the maxillary splint would also function as a retainer, if she decided to proceed with the splint therapy as recommended by Dr. Piper.

A.R. 333-34.

The doctor also noted that Volkert had additional concerns relating to the cost of the treatment and the long travel distance between her home and the doctor's office. Volkert stated she would give the treatment some thought and call Dr. Clary's office in a day or two. She also noted the bite impressions the doctor had taken were "the easiest impressions she had ever had, and [she] was pleased with the approach." A.R. 334. Volkert did not follow through with the splint treatment from Dr. Clary. In a letter dated July 7, 2004, Dr. Clary indicated her only limitations from her TMJ dysfunction would be the avoidance of gum chewing and the extensive chewing of hard foods. He opined that her pain would be "controlled by occlusal orthotic appliances, pain medications," and joint surgery, if necessary. A.R. 330.

On June 7, 2004, Volkert was seen by a nurse practitioner in the Marcus Clinic with complaints of bilateral jaw pain. She indicated the pain had begun after she saw Dr. Clary, who had done "some pushing and some pulling on her teeth" during his evaluation. She rated the pain at a 9 out of 10, and stated she also had severe ear pain. She refused pain medications, and was directed to work with physical therapy. A.R. 289.

On June 14, 2004, Volkert saw the nurse practitioner at the Marcus Clinic for complaints of pain in the left side of her left foot into the heel area. She stated her foot

had been hurting for several months, and she thought she might have aggravated it the day before "while she was doing some gardening." A.R. 288.

On June 21, 2004, Volkert went to see another dentist, Michael Sesemann, D.D.S., for evaluation in connection with a jaw splint. She told Dr. Sesemann that Dr. Clary had been "way too rough." A.R. 678. The doctor wanted to see her May 17, 2004, MRI films, but Volkert called his office at 7:15 a.m. the next morning questioning the need for the MRI, and indicating she did not believe Dr. Sesemann was qualified to read it. She called early the next morning, stating she had not signed a release to have her MRI sent to them, and indicating that because she had "been 'duped and worked over' by other dentists she didn't want it sent." Dr. Sesemann talked with Volkert and noted she was "irrational and untrusting," and "said she would stop payment on her check because [he] hadn't 'addressed her teeth.'" Volkert called back a few minutes later to state she was "fearful." Notes indicate Volkert was "unable to focus in on the conversation," and she made rambling, irrelevant comments. A.R. 677. The doctor elected to return all of Volkert's notes to her, zero out her account, and cease any further treatment relationship with her. A.R. 675.

On July 15, 2004, Volkert saw Paul Coffin, D.P.M. for evaluation of her foot and ankle problems. He diagnosed her with joint inflammation and plantar fasciitis of both feet, and some early degenerative arthritis. He instructed Volkert in some stretching exercises to do daily, and recommended some orthotics to stabilize her lower extremities and make her more comfortable. Volkert declined the orthotics the doctor recommended, requesting something softer. He ultimately ordered the orthotics Volkert requested, but noted he would "not take any responsibility as to whether it is helping her or not." A.R. 609. He advised Volkert that it would take her some time to get used to the orthotics and advised her to break them in gradually. A.R. 606.

Volkert continued to see chiropractors and physical therapists regularly over the next two years, and she also continued to see different practitioners about splint treatments

11

for her TMJ condition. She eventually obtained a jaw splint but complained that it caused her excessive pain. On March 6, 2006, the physical therapist who had treated Volkert off and on since March 2002 completed a medical source statement regarding Volkert's functional abilities. A.R. 657-62. He opined Volkert could lift and carry up to twenty pounds occasionally, with twelve repetitions at eight pounds; sit for four hours at a time for a total of six hours in an eight-hour workday; stand and walk for twenty minutes each, for a total of three hours each in a work day; perform reaching activities and push/pull activities occasionally with both hands; operate foot controls occasionally with both feet, as allowed by her sitting limitations; and perform handling, fingering, and feeling activities frequently with both hands. He indicated Volkert's handling ability "is limited by [her] ability to lock down for extended periods of time." A.R. 659.

The physical therapist further indicated Volkert could perform all types of postural activities occasionally, "[l]imited by low back pain with radicular symptoms. Confirmed with clinical findings [such as] SLR [straight-leg-raising] test, slump test)." A.R. 660. He opined Volkert could tolerate exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle occasionally, and she could tolerate humidity and wetness, extreme cold, and extreme heat frequently. He based these latter opinions on Volkert's "self reports of what increases her symptoms and brings her to the clinic." A.R. 661. He further indicated Volkert could not sort, handle, or user papers or files, because she is unable to look down for an extended time without having pain and headaches. He indicated she would be able to perform activities like shopping, travel without a companion for assistance, ambulate without using an assistive device, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps with the use of a single hand rail, prepare a simple meal and feed herself, and care for her personal hygiene. A.R. 662. Finally, the physical therapist opined Volkert's limitations would last for twelve consecutive months or more. *Id.*

LeAnn Jons-Cox, D.O. completed physical and mental medical source statements regarding Volkert on March 14, 2006. A.R. 295-705. However, the doctor indicated she had only assumed Volkert's care in February 2006, and Volkert testified she had only seen the doctor once. The doctor's opinions are based primarily on Volkert's complaints at her office visit. As such, the doctor's opinions are entitled to little weight.

Kristy Farnsworth, Ph.D. reviewed the record and completed a Psychiatric Review Technique form on March 20, 2006. In addition, Dr. Farnsworth testified at the ALJ hearing. In Dr. Farnsworth's opinion, Volkert suffers from an Adjustment Disorder that would cause her mild difficulties in maintaining concentration, persistence, or pace, but no other functional limitations.

The ALJ found Volkert has not engaged in substantial gainful activity since her alleged disability onset date. He noted most of the voluminous medical records provided by Volkert relate to physical therapy, "apparently after the claimant's automobile accident and apparent subsequent litigation, which the record indicates has since been dismissed, and of dental records for TMJ." A.R. 24. The ALJ further noted, "Although provided an opportunity, the claimant provided very brief responses to direct questions or at times would not even answer, and she volunteered very little additional information." *Id.*

The ALJ found Volkert does not have any severe impairments, and her only medically determinable impairments are TMJ syndrome, thyroidism, and an adjustment disorder. The court agrees that the record does not indicate Volkert has severe *physical* impairments that would prevent her from working. However, the record is much less clear with regard to her mental status.

The ALJ discounted the opinions of Dr. Jons-Cox regarding Volkert's mental functional abilities based on the doctor's limited contact with Volkert. However, he relied heavily on the opinions of Dr. Farnsworth, who had not examined Volkert even once and had made only a paper review of the record. The ALJ failed to discuss the extensive neuropsychological evaluation from March 2004, nor did he discuss the treatment notes

of several of Volkert's treating physicians indicating Volkert had difficulty concentrating, rambled and was unable to remain focused during conversations, and exhibited somewhat bizarre behaviors and responses to stimuli at times. The ALJ repeatedly cut off Volkert's attempts to respond to his questions. In his opinion, he simply dismissed her failure to respond, without any discussion or observations of the rambling, unfocused nature of Volkert's responses. Given the nature of the claimant's behavior and responses, the court finds the ALJ erred in failing to develop the record further by obtaining an independent psychological evaluation of the claimant.

In considering an argument that an ALJ has failed to develop the record fully, the relevant inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, we will not remand." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)). "The question is whether medical evidence already in the record provides a sufficient basis for a decision in favor of the Commissioner." *Scott v. Apfel*, 89 F. Supp. 2d 1066, 1076 (N.D. Iowa 2000) (Bennett, C.J.). *See also Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir. 1987) (claimant must show prejudice or unfairness resulting from an incomplete record); *accord Anderson v. Chater*, 73 F.3d 366 (table), 1995 W.L. 763052 at **2 (8th Cir. 1995). Here, Volkert has been prejudiced by the ALJ's reliance on a single paper review of the record by a medical expert, where the weight of the evidence suggests the claimant is more significantly impaired than the consultant's paper review would indicate.

In addition, the ALJ erred in failing to conduct a full and fair hearing. *See Bishop v. Sullivan*, 900 F.2d 1259, 1262 (8th Cir. 1990) ("It is the ALJ's duty to develop the record fully and fairly, even in cases in which the claimant is represented by counsel. *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985).") The Third Circuit has explained in detail how the right to a full and fair hearing includes not only development of the

record from the standpoint of documentary evidence; it also includes the conduct of the hearing. That court's discussion is particularly apropos here:

> Applicants for social security disability payments, most of whom are truly ill or disabled, are entitled to be treated with respect and dignity no matter what the merits of their respective claims. . . . [R]udeness, impatience, or outright bias cannot be tolerated. . . .
>
> . . . .
>
> Essential to a fair hearing is the right to an unbiased judge. *Hummel [v. Heckler]*, 736 F.2d [91,] 93 [3d Cir. 1984)]. The due process requirement of an impartial decision-maker is applied more strictly in administrative proceedings than in court proceedings because of the absence of procedural safeguards normally available in judicial proceedings. *Id.*
>
> . . . .
>
> The right to an unbiased ALJ is particularly important because of the active role played by ALJs in social security cases. *See Hess [v. Secretary of H.E.W.]*, 497 F.2d [837,] 840-41 [3d Cir. 1974)]. ALJs have a duty to develop a full and fair record in social security cases. *See Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995); *Smith v. Harris*, 644 F.2d 985, 989 (3d Cir. 1981). Accordingly, an ALJ must secure relevant information regarding a claimant's entitlement to social security benefits. *Hess*, 497 F.2d at 841. In *Hess* we reasoned that "[a]lthough the burden is upon the claimant to prove his disability, due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a typical suit in a court of record where the adversary system prevails." *Id.* at 840.

*Ventura v. Shalala*, 55 F.3d 900, 901-02 (3d Cir. 1995). The *Ventura* court pointed out that in an administrative hearing, the ALJ "has an affirmative obligation to actually assist the claimant in developing the facts, rather than acting either as an adversary or creating 'an atmosphere of alternating indifference, personal musings, impatience and condescension.'" *Ventura*, 55 F.3d at 904, 905 (quoting *Rosa v. Bowen*, 677 F. Supp.

782, 783 (D.N.J. 1988)); *see also Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) ("[U]nlike the typical judicial proceeding, a social security disability hearing is nonadversarial . . . with the ALJ responsible in every case 'to ensure that an adequate record is developed during the disability hearing consistent with the issues raised[.]'" (Citations omitted.))

> The Eighth Circuit agrees, noting it is the Secretary's:
>> "'duty to develop the record fully and fairly, even if . . . the claimant is represented by counsel.'" *Boyd v. Sullivan*, 960 F.2d 733, 736 (8th Cir. 1992) (quoting *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983)). This is so because an administrative hearing is not an adversarial proceeding. *Henrie v. Dept. of Health & Human Serv.*, 13 F.3d 359, 361 (10th Cir. 1993). "[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice." *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988). Moreover, "[a]n adequate hearing is indispensable because a reviewing court may consider only the Secretary's final decision [and] the evidence in the administrative transcript on which the decision was based." *Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir. 1992) (per curiam).

*Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994); *accord Cox v. Apfel*, 160 F.3d 1203, 1209 (8th Cir. 1998); *Johnson v. Callahan*, 968 F. Supp. 449, 458 (N.D. Iowa 1997); *Barry v. Shalala*, 885 F. Supp. 1224, 1241-42 (N.D. Iowa 1995).

> In the present case, this court echoes the Third Circuit's conclusion in *Ventura* that:
>> "Once we foresake [sic] fairness and due process because of the pressure of heavy caseloads, then our system of justice will end. Although administrative hearings are not formal trials, [neither] should they be so informal or limited that their fairness is destroyed."

*Ventura*, 55 F.3d at 905 (quoting *Rosa v. Bowen, supra*). *See Heckler v. Campbell*, 461 U.S. 458, 471 & n.1, 103 S. Ct. 1952, 1959 & n.1, 76 L. Ed. 2d 66 (1983) (Brennan, J., concurring) (ALJ's "duty of inquiry . . . rises to a 'special duty . . . to scrupulously and

conscientiously explore for all relevant facts' . . .," citing *Broz v. Schweiker*, 677 F.2d 1351, 1364 (11th Cir. 1982), and decision maker should "inform himself about facts relevant to his decision and . . . learn the claimant's own version of those facts."); *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997).

The ALJ cut off Volkert's responses, and failed to delve deeper when she lost focus and failed to answer the questions he asked. He appeared impatient and hurried throughout the hearing, and did not allow Volkert's attorney the opportunity to present the case fully.

For these reasons, the Commissioner's decision is **reversed** and this case is **remanded** for further development of the record, to include a mental health evaluation, and such further proceedings as may be necessary to make a full and fair consideration of Volkert's application for benefits.

**IT IS SO ORDERED.**

**DATED** this 23rd day of March, 2009.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT